**BRUCH, Richard, Chubb, John R. and Schade, Albert and Schollenberger, Richard and Smith, Ronald R. and Smolinski, Leonard A. In their individual capacities and as representatives of the class of former, salaried, non-union employees of the Firestone Plastics Division which was sold to the Hooker Chemical Division of the Occidental Petroleum Corporation, Appellants,**

v.

**FIRESTONE TIRE AND RUBBER COMPANY and Firestone Tire & Rubber Company Retirement Plan for Salaried Employees and Firestone Tire & Rubber Company Stock Purchase and Savings Plan, Appellees.**

No. 86–1448.

United States Court of Appeals, Third Circuit.

Argued Dec. 19, 1986.

Decided Aug. 31, 1987.

Rehearing and Rehearing In Banc Denied Sept. 25, 1987.

---

Paula R. Markowitz (argued), Markowitz & Richman, Philadelphia, Pa., for appellants.

Martin Wald (argued), Deena Jo Schneider, Arden J. Olson, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees.

Before HIGGINBOTHAM and BECKER, Circuit Judges, and DUMBAULD, District Judge.[*]

---

[*] The Honorable Edward Dumbauld, United States District Court for the Western District of

## OPINION OF THE COURT

BECKER, Circuit Judge.

Three classes of former salaried employees of the Plastics Division of defendant Firestone Tire & Rubber Co ("Firestone") allege that the administrator of Firestone's pension and welfare plans improperly denied them various benefits allegedly due under those plans. The "rub" is that the plan administrator is Firestone itself—which is also the sole source of funding for the plan at issue in Count I. To evaluate plaintiffs' claims we must address important questions about the scope of judicial review of decisions by pension plan administrators on plan participants' claims for benefits.

Proceeding individually, the named plaintiffs also contend that the plan administrator did not respond properly to their requests for information. In Count VII of their complaint, these plaintiffs invoke the statutory remedy for that wrong provided in § 502(c) of ERISA, 29 U.S.C. § 1132(c), and ask the court to order defendants to pay each named plaintiff damages of $100 per day.

After concluding that the plan administrator's decision to deny benefits should be reviewed under the deferential arbitrary and capricious standard, the district court granted summary judgment for defendants on all of the counts now before us, 640 F.Supp. 519. We affirm that decision with respect to Counts III and V, but reverse with respect to Counts I and VII.

With regard to Count I, we hold that the decision by Firestone to deny benefits under the Termination Pay plan should be reviewed de novo by the court and that there should be deference to neither the plan administrator's nor the participants' construction of plan terminology. We accordingly remand so that the district court can decide the proper construction of the relevant plan language.

With regard to Count VII, we hold that an individual has standing to request damages pursuant to § 502(c) of ERISA even if he is no longer an employee and is not

entitled to any benefits other than those he has already received when he requested information under that provision. Section 502(c) confers wide discretion on the district court, however, to determine how much the claimant should receive in damages. We remand Count VII to permit the district court to exercise that discretion.

## I. BACKGROUND FACTS AND STATEMENT OF CONTENTIONS

The three plaintiff classes consist of a total of over 500 former salaried employees of the Plastics Division of defendant Firestone Tire & Rubber Co. When Firestone sold its Plastics Division to the Occidental Petroleum Corporation on November 30, 1980, "most if not all" of the class members were offered the opportunity to continue in the positions they had occupied under Firestone. Most accepted. Firestone maintained three welfare or pension plans which are relevant for present purposes.

First, under the Termination Pay plan Firestone provided severance pay to salaried employees under certain conditions discussed in detail below. After the sale of the Plastics Division, plaintiffs requested benefits pursuant to that plan but Firestone denied them. Plaintiffs challenge that denial in Count I.

Second, under the Retirement Plan, Firestone offered defined retirement benefits if employees retired at age 65; it offered other somewhat smaller benefits if employees took early retirement, which they could do under certain limited circumstances. The Retirement Plan also offered deferred vested benefits, which were smaller than either the regular or the early retirement benefit, to employees who could not meet the conditions for either regular or early retirement but who could meet other less stringent conditions. After the sale of the Plastics Division plaintiffs sought early retirement benefits, but Firestone denied their claims and awarded only the lesser

Pennsylvania, sitting by designation.

deferred vested benefit. Plaintiffs challenge this decision in Count III.

Firestone also maintained a Stock Purchase Plan, under which one class of plaintiffs had been accumulating stock. When Firestone sold the Plastics Division some of these class members' accumulated stock rights had not vested pursuant to the Plan. In Count V, plaintiffs contend that the sale of the Plastics Division was a partial termination under ERISA, 26 U.S.C. § 411(d)(3), automatically vesting their rights under the Plan on the date of the sale.

Finally, after the sale several of the named plaintiffs wrote to Firestone to request information about their benefits under each of the above plans. Plaintiffs contend that Firestone failed to respond properly to these requests, as required by section 502 of ERISA.[1] That provision also gives participants and beneficiaries a private right of action for damages against the plan administrator if the administrator does not fulfill his § 502(c) obligations. The named plaintiffs who sought information press that right of action in Count VII.

The district court granted summary judgment for defendants on all of the above claims. The court also dismissed several other counts, but plaintiffs do not appeal these decisions.[2]

At the heart of the district court's opinion granting summary judgment on Counts I, III and V was the court's deference to decisions by the plan administrator. In each case the administrator based its denial of claims on a construction of plan language. The district court believed that it could not reverse the administrators' constructions of the plans' terms unless they were arbitrary and capricious, and it felt obliged to uphold the administrator's decisions given that standard of review.

At the core of the plaintiffs' challenge to the district court's decision is their contention that the district court should not have applied the arbitrary and capricious standard in this case. We now address that contention.[3]

## II. SCOPE OF REVIEW

### A. *Plaintiffs' Contentions*

Plaintiffs argue that both the common law of trusts and federal common law developed pursuant to ERISA counsel against deferring to decisions by fiduciaries with interests adverse to those of the claimants. Such a conflict can occur, for example, if the employer is the plan administrator and the plan provides that the employer's con-

---

1. ERISA section 502(c) requires employers to respond within thirty days to requests by plan participants for certain kinds of information. Specifically, § 502(c) incorporates by reference the information producing requirements set out in ERISA § 105, 29 U.S.C. § 1025. That provision requires plan administrators to tell participants and beneficiaries the total amount of their accrued benefits and "the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which benefits will become nonforfeitable." 29 U.S.C. § 1025(a)(1) and (2).

2. Count II, which alleged that a partial termination of the Retirement Plan had taken place, was withdrawn by stipulation; it later became the gravamen of another lawsuit, *Sikora v. Firestone Tire & Rubber Co.,* which has since been settled. Count IV, which sought return of employee contributions to the Retirement Plan, was also withdrawn by stipulation. Count VI, in which plaintiffs sought credit for vacation time accrued but not yet taken, remained in the case throughout the district court proceedings. The district court granted summary judgment for Firestone on that Count, and plaintiffs have not appealed that decision.

3. Defendants argue that the propriety of the arbitrary and capricious standard was not properly challenged in the district court and therefore that the issue cannot be raised on appeal. We reject this contention for two reasons.

It is true that the plaintiffs did not argue in the district court in terms that the arbitrary and capricious standard was inappropriate. But while plaintiffs accepted the label, they did disagree with the defendants in the district court about the amount of deference which the court should accord the plan administrator's decision. We therefore think that the substance of the question of deference was sufficiently raised in the district court.

More importantly, the decision challenged in Count I is based entirely on the plan administrator's construction of a certain key term. We find ourselves unable to decide whether that construction should resolve the case—a question which even the defendants want us to answer—without deciding how much deference should be accorded the plan administrator's decision. We therefore must decide the proper scope of review.

tributions in a given year are determined by the cost of satisfying plan liabilities in the prior year. Or, as in this case with respect to Count I, a conflict of interest may occur if the plan administrator is also the employer and the plan is unfunded, so that any benefits provided by the plan are paid directly by the employer out of its general corporate funds.

Plaintiffs advance two arguments to justify rejection of the arbitrary and capricious standard, and though these theories are based on different legal principles they produce essentially the same result. First, plaintiffs argue that the principles of trust law should control, that under trust law the plan administrator owes the employees a fiduciary duty, and that courts enforce that duty by construing all plan language "solely in the interest of the beneficiary." Plaintiffs argue further that the sole benefit standard requires courts to construe all ambiguities in plan language in favor of the beneficiaries, and in favor of coverage.

Alternatively, plaintiffs argue that contract law controls, that the welfare plan at issue in Count I is a unilateral contract drafted by defendant Firestone, and that the principles of contract law require that ambiguities be construed against the draftsman. The result under this theory is also to construe ambiguities regarding cov-

erage in favor of the employee or former employee requesting benefits.

### B. Current Law on the Scope of Review

■ The clear weight of authority under ERISA is against the plaintiffs' position. As defendants correctly note in their response to plaintiffs' argument, most courts of appeals have applied the arbitrary and capricious standard when considering challenges to plan administrators' denial of benefits. *Kosty v. Lewis*, 319 F.2d 744 (D.C.Cir.1963); *Miles v. New York State Teamsters Conference*, 698 F.2d 593 (2d Cir.1983); *Holland v. Burlington Industries*, 772 F.2d 1140 (4th Cir.1985), affirmed mem. as *Brooks v. Burlington Industries*, —— U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 559, cert. denied as *Slack v. Burlington Industries*, —— U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986);[4] *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir.1982); *Varhola v. Doe*, 820 F.2d 809 (6th Cir.1987); *Blakeman v. Mead Containers*, 779 F.2d 1146 (6th Cir.1985); *Pabst Brewing Co. v. Anger*, 784 F.2d 338 (8th Cir.1986) (per curiam); *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149 (9th Cir.1986); *Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518 (11th Cir.1985).[5] Most of

---

**4.** A summary affirmance by the Supreme Court has precedential value, see Robert L. Stern, et al., *Supreme Court Practice* 287 (6th ed. 1986). But the petition for certiorari which the Court granted, and with respect to which it affirmed, presented only the question whether ERISA preempted state regulation of the severance plan. See 54 U.S.L.W. 3237 (1986). The summary affirmance in *Brooks* therefore does not affect the question of scope of review.

A second petition for certiorari was also filed in this case, which did ask the Court to rule on the propriety of the arbitrary and capricious standard. See *Slack v. Burlington Industries*, 54 U.S.L.W. 3470. That petition was denied, see —— U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); such a decision, of course, has no precedential weight.

**5.** This Court has not taken a position on this issue. We have held:

When the amount of benefits to which a distinct group of beneficiaries is entitled [is at issue], pension trustees must necessarily strike a balance between the interests of the beneficiaries who are members of this group and beneficiaries who are not.... Because

the trustees in these circumstances must reconcile competing interests of different beneficiaries, the trustees' choice cannot be said to violate their fiduciary duty unless it is arbitrary and capricious.

*Edwards v. Wilkes Barre Publishing Co. Pension Trust*, 757 F.2d 52, 56 (3d Cir.1985), quoted with approval in *Northeast Dep't ILGWU v. Teamsters Local No. 229*, 764 F.2d 147, 163 (3d Cir.1985). See also *Gaines v. Amalgamated Insurance Fund*, 753 F.2d 288 (3d Cir.1985) (applying arbitrary and capricious standard without noting whether or not plan was established pursuant to § 302, but where propriety of arbitrary and capricious standard was not challenged).

We explained in *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325, 333 (3d Cir.1984), however, and reiterate in this opinion, that while the arbitrary and capricious standard should be applied only when the trustee is choosing among beneficiaries; when one of the possible beneficiaries of the trustee's decisions is the trustee himself, this degree of deference is inappropriate.

these courts—though, as we discuss below, not all—have applied this standard without stopping to ascertain whether the plan's funding obligations gave the plan administrator an interest adverse to the claimants with respect to the question whether benefits should be paid.

The arbitrary and capricious standard has not been applied unanimously, however, or without misgivings. First, recognizing the possibility that an interested decisionmaker's bias may prejudice him against the claimant and thereby deprive the claimant of an impartial hearing, this Court has explained in detail why it refused to defer to decisions made under ERISA by such fiduciaries.

In *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325 (3d Cir.1984), we declined to apply the arbitrary and capricious standard when reviewing a decision by plan administrators to return to the employers money which the employers had paid to fund a specified level of employee benefits. The beneficiaries alleged that if the trustees had fulfilled their duty to act "solely in the interest of the beneficiaries," ERISA § 404, 29 U.S.C. § 1104, they would have used the excess to purchase more benefits for the employees rather than returning the surplus to the

employers. We held that when beneficiaries sue claiming that plan fiduciaries "have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests," reviewing courts must "apply the strict statutory standards of ERISA" rather than "the more deferential 'arbitrary and capricious' standard." 732 F.2d at 333–34.[6]

Second, even some courts that apply the label "arbitrary and capricious" to describe the scope of their review in fact subject plan administrators' decisions to more rigorous review than that normally accorded under the arbitrary and capricious standard under certain circumstances, especially when the plan administrator possesses an adverse interest. A line of cases in the Ninth Circuit provides one example. In *Harm v. Bay Area Pipe Trades Pension Plan Trust Fund*, 701 F.2d 1301, 1305 (9th Cir.1983) (citations omitted), the court held that if a plan provision excludes a "disproportionate number" of participants from benefits, "the burden shifts to the trustees to show a reasonable purpose for the exclusion." Similarly, in *Jung v. FMC Corp.*, 755 F.2d 708, 711–12 (9th Cir.1985), the same court construed the arbitrary and capricious standard to provide:

Where, as here, the employer's denial of benefits to a class avoids a very consider-

---

**6.** A number of cases, both in and out of the pension context, rely on similar principles. One such case in the pension area is *Teamsters Local 115 v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3rd Cir.1986), affirmed without opinion by an equally divided Court, ⸺ U.S. ⸺, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). There we struck down one part of the arbitration provisions of the Multiemployer Pension Plan Amendments Act because it violated the due process clause of the Fifth Amendment. Pursuant to MPPAA, plan trustees—who had a fiduciary duty to maximize the value of the plan's fund—decided the amount owed to a Multiemployer Pension Plan by an employer withdrawing from the plan. In subsequent challenges to the trustees' decision the trustees' determination was to be presumed correct, and reversed only if the withdrawing employer could show "by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. 1401(a)(3)(A). We held the statute unconstitutional because according this presumption of correctness to the decision of an interested party deprived the withdrawing employer of a fair hearing. 787 F.2d at 142.

A line of California cases relies on the same principle. In *Graham v. Scissor-Tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165 (1981) the California Supreme Court held an arbitration agreement unconscionable, and refused to enforce it, because it designated as arbitrator a member and former official of the labor union of which one of the parties was a member. This principle, however, was not offended in *Dryer v. Los Angeles Rams*, 40 Cal.3d 406, 220 Cal.Rptr. 807, 709 P.2d 826 (1985), because the panel which served as arbitrator was composed of two members representing one side and two representing the other. See also *In re Cross & Brown Co.*, 4 A.D.2d 501, 167 N.Y.S.2d 573 (App.Div.1957), which declined to enforce an arbitration agreement between a real estate broker and his employer because it appointed the employer's Board of Directors as arbitrator. The court held that such an agreement contravenes the "well-recognized principle of 'natural justice'" that "a man may not be a judge in his own cause." Id. 167 N.Y.S.2d at 575.

able outlay [by the employer], the reviewing court should consider that fact in applying the arbitrary and capricious standard of review. Less deference should be given to the trustee's decision.

Finally, in *Dockray v. Phelps Dodge Corp.,* 801 F.2d 1149, (9th Cir.1986) the court defined the standard of review with great care, shaping it in response to "the countervailing tugs of divided loyalty pulling" at the plan administrator.

At the time that Administrator/Employee Benefits' Director McGowan denied Dockray's pension application [a] strike [against the employer] had entered its third month. The strike had been unusally bitter and violent. The Governor of Arizona had sent National Guardsmen to protect replacement workers as they crossed the lines of massed pickets outside the mine gates. Scuffles, property damage, vigilante violence, and numerous arrests had attracted national media attention to the dispute. For Dockray to "win" his pension would no doubt have boosted the strikers' morale at a time when Phelps Dodge had apparently succeeded in overcoming the picketing and had fully staffed the mine with replacement workers. Given this highly charged atmosphere, we think it unrealistic to grant the same substantial deference to the consideration of Dockray's application by an administrator who is also a senior member of Phelps Dodge management as we would to the decision of a wholly independent fund trustee in similar circumstances.

On remand, the burden of persuasion, of course, remains with Dockray. To prevail, Dockray must show that the Administrator breached his statutory fiduciary duty to act "for the sole and exclusive benefit" of the fund's beneficiaries, including Dockray. 29 U.S.C. § 186(c)(5). The court will weigh the Adminstrator's rebuttal of Dockray's evidence of bias against the arbitrary and capricious standard. However, the district court should be appreciably more critical of the reasons advanced by the Administrator, and less willing to resolve all ambiguities in the Administrator's favor, than the court

would be if the fund were administered by an independent trustee.

801 F.2d at 1152–53 (footnote omitted).

Similarly, in *Dennard v. Richards Group, Inc.* 681 F.2d 306, 314 (5th Cir. 1982) the Fifth Circuit held that whether a plan administrator's interpretation of a term is arbitrary and capricious turns, inter alia, on the "legally correct" meaning of the term. The Fifth Circuit also emphasized that the facts of a particular case should influence the district court reviewing a plan administrator's decision. On remand, therefore, the district court was instructed to consider the "factual background of the determination by a plan and inferences of lack of good faith, if any." 681 F.2d at 314.

We believe that these cases reflect significant dissatisfaction with the arbitrary and capricious standard when the employer can profit from its decision to deny benefits. We also believe, however, that the propriety of the standard depends on the context in which it is used. In particular, we think it important to distinguish between the standard's use under some ERISA plans and its use in review of decisions made by trustees of plans established pursuant to § 302(c) of the Labor Management Relations Act, 29 U.S.C. § 186(c). We can explain this distinction best by tracing the development of the arbitrary and capricious standard. As the discussion in Part I C shows, the standard reached ERISA after it was adopted from the common law of trusts by courts construing the LMRA. The safeguards present in the LMRA distinguish that context from many administrative decisions made under ERISA and indicate that the standard should apply in only some ERISA contexts.

### C. *The Origin of the Arbitrary and Capricious Standard*

The arbitrary and capricious standard governs judicial review of plan administrators' decisions in pension plans set up under § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), see e.g., *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182 (3d Cir.1984), and

courts appear to have imported the standard into ERISA by analogy to cases concerning LMRA plans. As we explained in *Struble*, 732 F.2d at 333:

> The "arbitrary and capricious" standard derives from section 302(c)(5) of the LMRA. That section imposes a duty of loyalty on section 302 trustees by permitting employer contributions to a welfare trust fund only if the contributions are used "for the sole and exclusive benefit of the employees...." Section 1104 of ERISA imposes a similar duty of loyalty, and not surprisingly the courts have applied the "arbitrary and capricious" standard under ERISA as well.

See, e.g., *Music v. Western Conference of Teamsters Pension Trust Fund*, 712 F.2d 413 (9th Cir.1983). The LMRA cases, in turn, borrowed principles from the common law of trusts—a body of law which also formed the basis for ERISA itself. We therefore begin our analysis with a brief review of the relevant trust law doctrines.

■ The paradigmatic common law trustee must act solely for the benefit of the beneficiaries. Restatement (Second) of Trusts § 170. If the settlor of the trust instructs that the trust assets be distributed among the beneficiaries, without prescribing the method for doing so, he perforce relies on the trustee's discretion to determine how the allocation should be made. Courts therefore respect the allocation decision unless it constitutes an abuse of discretion. See id. § 187, which provides:

> Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.

Comment (g) to Restatement § 187 explains, however, that courts will not defer to a trustee's judgment when a conflict of interest threatens the trustee's impartiality:

> g. *Improper motive.* The court will control the trustee in the exercise of a power where he acts from an improper even though not a dishonest motive.... In the determination of the question whether the trustee in the exercise of power is acting from an improper motive the fact that the trustee has an interest conflicting with that of the beneficiary is to be considered.

Building on these trust law principles, the Labor Management Relations Act created a framework within which employers could set up pension plans for their unionized employees. Under § 302(c)(5) of the LMRA, however, "employees and employers [must be] equally represented in the administration of [the pension or welfare] fund." The LMRA sets out elaborate requirements intended to protect the plans it authorizes from control by a party biased toward either the employees or employer.[7]

The arbitrary and capricious standard was first used under LMRA plans in a line of cases in the district court for the District of Columbia (and subsequently approved by the D.C. Circuit). These cases have two themes.

First, the courts discussed the impartiality of the LMRA decisionmakers, and they relied on that impartiality in settling on the arbitrary and capricious standard. Second, the cases also attempted to determine whether an employee's interest in his pension benefits was contractual or equitable. If the former, these first courts believed, then judicial review of an administrator's decision would be de novo, as would a court's review of a standard breach of contract claim. If the interest was equitable, however—as is a beneficiary's interest in his right to receive benefits pursuant to a trust—then the court would be more deferential.

---

**7.** Section 302(c)(5)(B) provides as follows:

in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement [must] provide[ ] that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office.

Both of these themes reappear in the current debate about the appropriate scope of review under ERISA. It will therefore be helpful to review these early cases in some detail.

The first court to address these questions was *Van Horn v. Lewis*, 79 F.Supp. 541 (D.D.C.1948), decided approximately a year after the passage of the LMRA. There the employer Trustee of a § 302 plan challenged the Trustees' decision to set benefits at a particular level. The district court noted that the LMRA divided power equally between employer and employee representatives, holding that the plan "specifically gives each Trustee equal power both in the establishment of the Fund and its administration." For this reason and because the plan was "a beneficial Fund, and the rules applicable to charitable trusts undoubtedly apply," the court held that "the majority of the Trustees have a right to act" so long as their decision is not "improper, unbusinesslike, or not in accordance ... with the letter and the spirit of the Labor Management Relations Act." Id. at 544.

In *Hobbs v. Lewis*, 159 F.Supp. 282 (D.D.C.1958), the de novo approach surfaced for the first time. There the court reviewed a plan administrator's denial of benefits. The Pension Plan relied on *Van Horn* to contend that "the Fund is a charitable trust" and therefore "that the court cannot interfere in its decisions unless the Trustees act arbitrarily or unreasonably." The district court rejected that contention, however, holding:

In the first place, I do not agree that this Fund is a charitable trust, involving mere gratuities, but am of the opinion that money paid from [the plan] is in the nature of a fringe benefit, a term of recent origin, or deferred, contingent compensation which the employees of signatories may be entitled to receive in addition to their wages, and which was procured for them by their bargaining

agent, the United Mine Workers of America.... An employee therefore has a contractual right to this pension if and when he comes within the regulations prescribed by the Trustees.

159 F.Supp. at 286. The Trustees also pointed to a term in the Trust agreement "which grants them full authority in respect of coverage, eligibility, amounts of benefits, etc." Id. The district court construed this clause to grant the Trustees

the right to set up requirements for eligibility, etc., which they have done ... and to pass upon applications for pension when made and determine whether they come within the requirements. However, I do not believe it comprehends the deprivation of an applicant's right of recourse to the Courts when he disagrees with the determination of the Trustees on this point, regardless of whether they acted arbitrarily or unreasonably.

Id.

The debate continued in *Ruth v. Lewis*, 166 F.Supp. 346 (D.D.C.1958). There the trustees pointed to language in the plan document making them responsible for the decision whether to grant or deny benefits, and they contended that this language committed the benefits decision entirely to their discretion, so that there could be no judicial review at all. The district court disagreed, holding

This Court is of the opinion that despite the contractual provisions in the trust instrument giving absolute discretion to determine eligibility to the fund, judicial review does lie where applicants can show a breach of fiduciary trust, fraud or arbitrary action.

166 F.Supp. at 349 (footnotes omitted).[8]

Judge Holtzoff, writing in 1960 in *Kennet v. United Mineworkers of America*, 183 F.Supp. 315 (D.D.C.1960) still found the question vexing. He began his answer by noting that the LMRA "authorized the establishment of welfare funds by employers

8. In so holding the district court applied the principle articulated in § 187 of the Restatement (Second) of Trusts:

Where discretion is conferred upon the trustee with respect to the exercise of a power, its

exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.

See text above, typescript at 141.

for the sole and exclusive benefit of the employees of the employer and their families and dependents," and that "[t]he statute further provided ... that the employees and employers were to be equally represented in the administration of th[e] fund." Id. at 316. He then presented the trust law reasoning relied upon by *Ruth v. Lewis:*

> In effect, we are confronted with a trust fund governed by three trustees and a large groups of beneficiaries of the trust fund. One of the principal branches of equity jurisprudence has traditionally been the protection of the rights of beneficiaries of trust funds. A beneficiary of a trust fund is entitled and has always been entitled to have recourse to a court of equity to secure the proper performance of the duties of the trustees and his rights in the fund. Consequently, on this ground alone the Court would have the power to determine the plaintiff's legal rights in the fund and the correctness of the action of the trustees in denying him a pension.

183 F.Supp. at 317.

Judge Holtzoff then set out the contractual approach to the problem before him, which is much akin to the argument made before us by the plaintiffs here:

> There is another approach to this problem. Contrary to the argument of defendant's counsel, the payments made from the fund are not gifts or gratuities. The employer, in making payments into the fund, is not making a gift. This fund was established pursuant to a contract between the union and the employers governing the terms of employment. Payments into the fund are part of the compensation received by the employee over and above his weekly wages. The services rendered by him are the consideration for both his wages and his pension.... The employee may be regarded as a third party beneficiary to a contract....
>
> The Court concludes, therefore, that recourse to judicial action may be had to enforce rights under this fund and in such an action the Court will review the legal rights of the plaintiff and deter-

mine whether any erroneous decision has been reached by the trustees on questions of law. It will also review, to a limited extent, decisions of the trustees on questions of fact; certainly whether there is any substantial evidence sustaining the decision on questions of fact.... Finally, and it is not denied that this may be done, the Court will review the question of whether the action of the trustees is in any way arbitrary or capricious.

Id. at 317-18.

In reliance on this line of cases the District of Columbia Circuit settled on the arbitrary and capricious standard for review of decisions by plan administrators in § 302(c) plans. See *Danti v. Lewis,* 312 F.2d 345 (D.C.Cir.1962); *Kosty v. Lewis,* 319 F.2d 744 (D.C.Cir.1963). This circuit subsequently did likewise. See *Gomez v. Lewis,* 414 F.2d 1312 (3d Cir.1969).

### D. *Application of the LMRA Rule Under ERISA*

The first ERISA cases to invoke the arbitrary and capricious standard did so without any discussion of the differences between the LMRA and ERISA contexts. See, e.g., *Bayles v. Central States Pension Fund,* 602 F.2d 97, 99-100 and n. 3 (5th Cir.1979); *Bueneman v. Central States Pension Fund,* 572 F.2d 1208 (8th Cir. 1978). So have most subsequent cases. We believe, however, that in applying the common law of trusts under ERISA courts must be cognizant of the features that distinguish the ERISA arrangements from the paradigmatic common law situation. Both ERISA and the LMRA permit the trust form to be used by employers for the benefit of their employees even though—since they deal with each other at arms' length, like buyers and sellers of any other commodity—there will sometimes be conflicts of interest between those two groups. This difference does not prevent the trust form from being used, but it does require that trust principles not be applied mechanically in the new context.

In their oversight of a trust where the impartiality of the trustee had been care-

fully assured, the LMRA courts could easily adopt the principle of trust law applicable with respect to judicial review of an impartial trustee's execution of his duties. At least one court has done so in explicit reliance on § 187 of the Restatement of Trusts. See *Brune v. Morse*, 475 F.2d 858, 860 n. 2 (8th Cir.1973). Because the LMRA's precautions assure that the plan administrator will be neutral, it is easy to understand why the courts adopted this rule for judicial review of decisions made in the administration of an LMRA plan.

In the unfunded pension plan at issue in Count I of the complaint in this case, however, there is no assurance of the trustee's impartiality. The plan is controlled entirely by the employer, not by a group evenly divided between employer and employees. Because the plan is unfunded, every dollar provided in benefits is a dollar spent by defendant Firestone, the employer; and every dollar saved by the administrator on behalf of his employer is a dollar in Firestone's pocket. As we have already seen, the principle articulated in § 187 does not govern judicial review of such a trustee's decisions.

Two rationales are most frequently advanced to justify deference even in this context to fiduciaries' decisions. The first is that they have more expertise than judges in the management of pension plans; the implication is that the fiduciary whose decision is deferred to is more likely than the judge to have answered correctly the question about the meaning of the plan's term. See *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir.1985) (preferring the decision of plan administrators, "whose experience is daily and continual, [over that of] judges whose exposure is episodic and occasional;" see also *Ponce v. Construction Laborers Pension Trust*, 628 F.2d 537, 542 (9th Cir.1980) ("trustees are knowledgeable of the details of a trust fund (both its purpose and its operation), and thus they are in a position to make prudent judgments concerning participant eligibility.)"

We reject this rationale for two reasons. First, in the context of claims for benefits, the questions which courts must address do not usually turn on information or experience which expertise as a claims administrator is likely to produce. As in this case, the validity of the claim is likely to turn on a question of law or of contract interpretation. Courts have no reason to defer to private parties to obtain answers to these kinds of questions.[9] Secondly, as we have explained, there is a significant danger that the plan administrator will not be impartial. The lack of impartiality offsets any remaining benefit which the administrators' expertise might be thought to produce.[10]

Another rationale for deference is also commonly advanced—that courts should not interfere in the trustees' decision to aid one group of beneficiaries at the expense of another. We agree that deference to that kind of decision is entirely appropriate. *Struble*, 732 F.2d at 333 (upholding use of arbitrary and capricious standard where issue is "whether the trustees have correctly balanced the interests of present claimants against the interests of future claimants"). The same degree of deference should be accorded to investment decisions made by plan administrators, so long as a conflict of interest is not alleged.[11] As we explained

---

**9.** This is to be contrasted with, for example, a decision about how to invest plan funds. Deference in that context is entirely appropriate so long as the fiduciary makes no investment in the employer's business or commits some other, similar abuse.

It should be noted that we also do not deal here with a determination of fact by a plan administrator. We leave for another day the definition of the context, if any, in which courts should defer to such a determinations.

**10.** It has also been argued that deferring to the administrator's decision will make proceedings faster. We acknowledge that. But because the

speed is attained by sacrificing the impartiality of the decisionmaker, we think that it comes at too great a cost.

**11.** Our decision today is also not meant to address the scope of judicial review accorded a plan administrator's decision to change the terms a plan, by offering different or fewer benefits. See *Baker v. Lukens Steel Co.*, 793 F.2d 509 (3d Cir.1986). An employer's freedom to alter the terms on which it offers employee compensation may well be broader than its discretion to construe those terms while they remain unchanged—and after they have induced

in *Struble,* however, and as the discussion of the common law principles also makes clear, deference is inappropriate to the extent that the party who is alleged to have benefited from the challenged decision is not a beneficiary. Id. at 333–34 (arbitrary and capricious standard should not be applied where issue is whether "they have sacrificed valid interests to advance the interests of nonbeneficiaries" and noting that the employer is not a beneficiary). Here, of course, the employer—who also made the decision—is the party who benefited from the denial of benefits.

Even the cases from other circuits adopting the arbitrary and capricious standard have allowed plaintiffs to show that the plan administrator was influenced by some special kind of improper motive, though they begin with the presumption that the plan administrator was impartial. In light of the incentives facing employers we think that both common sense and the principles of trust law require rejection of that presumption.

### E. The Standard to be Applied Here

■ The principles of trust law instruct that when a trustee is thought to have acted in his own interest and contrary to the interest of the beneficiaries, his decisions are to be scrutinized with the greatest possible care. "Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty" which governs a trustee in the execution of his fiduciary duty. *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). *Struble* applied this standard to review a decision about how to use surplus plan assets.

This rule would suggest that any ambiguity in the trust document should be resolved in favor of the beneficiaries, and that is the result for which plaintiffs contend here. Application of this rule would produce exactly the opposite result from the one defendants contend for: under the arbitrary and capricious standard, a trustee's interpretation of the Plan's provisions stands unless it is unreasonable; as noted,

under the plaintiffs' theory, the claimant's interpretation wins so long as it meets the same low standard.

We reject the plaintiffs' rule for reasons similar to the ones that led us to reject defendants': plaintiffs, like defendants, mischaracterize the incentives motivating the parties. For example, with respect to Count I, the trustee (Firestone) is clearly not disinterested in the amount of severance pay awarded; its impartiality therefore cannot be relied upon to produce a fair result. But whether the trustee can be a reliable decisionmaker is an entirely separate question from whether—assuming an impartial adjudicator—the plan document should be construed in favor of the employer or the employees.

■ The trust at issue here provides severance benefits, which are a form of wages. The benefits were offered as an inducement to the plaintiffs, to persuade them to work for Firestone. See *Kennet v. United Mineworkers,* 183 F.Supp. at 317. See also *Inland Steel Co. v. N.L.R.B.,* 170 F.2d 247, 253 (7th Cir.1948), holding that "pension thus promised would appear to be as much a part of [the workman's] 'wages' as the money paid him at the time of the rendition of his services." In construing the agreement which embodies this aspect of the parties' bargain—the Termination Pay Plan—we therefore think it best to take as our starting point the principles governing construction of contracts between parties bargaining at arms' length. These principles counsel a construction of the trust document steering a middle course between the constructions of the document now offered by plaintiffs and defendants. In light of the arms' length relationship between employer and employee, that seems most fitting here. Thus the industry practice with respect to severance pay plans would shed light on this plan's meaning, as would past practice under the plan itself. We apply and elaborate on this contract construction standard in the following discussion.

reliance, as the terms of employment normally will.

## III. THE MERITS OF COUNT I (TERMINATION PAY)

As part of its compensation package for salaried employees Firestone's Handbook for Salaried Employees stated:

If your service is discontinued prior to the time you are eligible for pension benefits, you will be given termination pay if released because of a reduction in work force or if you become physically or mentally unable to perform your job.

The amount of termination pay you will receive will depend on your period of credited company service.

App. 283. The parties agree that under ERISA this statement creates—and constitutes—a Termination Pay Plan, which is an unfunded "Welfare Plan" as ERISA defines that term. See 29 U.S.C. § 1002(1). Because the statement has that significance, Firestone concedes that its Termination Pay plan was subject to the reporting and disclosure obligations governing all Welfare Plans. See 29 U.S.C. §§ 1021–1031. The parties also agree that Firestone did not comply with these obligations, though they disagree about the significance of that dereliction.

Plaintiffs requested termination pay pursuant to the Termination Pay plan, arguing that the sale of the Plastics Division constituted a "reduction in force" within the meaning of the plan. In its capacity as Plan administrator Firestone denied this request. Firestone believed that the sale of the Plastics Division did not constitute a "reduction in force" within the meaning of that term as it is used in the Termination Pay plan. In support of their contention plaintiffs rely on a line of cases holding that severance pay is due whenever an employee ceases to work for the employer (without having been fired for cause), even if the employer has sold the operation in which the employee worked and the operation's new owner has offered to retain the employee in his job. One rationale behind these cases is that salary and benefits may well be lower under the new employer, and that severance pay is intended to compensate the employee for these losses—not

merely to compensate for losses incurred as a result of unemployment. See *Chapin v. Fairchild Camera & Instrument Corp.*, 31 Cal.App.3d 192, 107 Cal.Rptr. 111 (1st Dist.1973); *Mace v. Conde Nast Publications, Inc.*, 155 Conn. 680, 237 A.2d 360, 363 (1967); *Dahl v. Brunswick Corp.*, 227 Md. 471, 356 A.2d 221 (1976); *Owens v. Press Publishing Co.*, 20 N.J. 537, 120 A.2d 442 (1956); *Adams v. Jersey Central Power & Light Co.*, 21 N.J. 8, 120 A.2d 737 (1956).

The district court granted summary judgment for defendants on this Count. It held that Firestone did not act arbitrarily or capriciously in construing the term "reduction in force" to exclude a sale in which the purchaser offers continued employment. Like the defendant, the district court adopted another line of cases allowing employers to refuse to provide severance pay when the employer sells the operation and the new owner offers all employees the opportunity to work for him. See, e.g., *Holland v. Burlington Industries*, 772 F.2d 1140 (4th Cir.1985), affirmed mem., ─ U.S. ─, 106 S.Ct. 3267, 91 L.Ed.2d 559, cert. denied, ─ U.S. ─, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); [12] *Pabst Brewing Co. v. Anger*, 784 F.2d 338 (8th Cir.1986) (per curiam); *Blakeman v. Mead Containers*, 779 F.2d 1146 (6th Cir.1985). A number of cases reach this result in construing the very Termination Pay plan at issue here. See *Adcock v. Firestone Tire & Rubber Co.*, 616 F.Supp. 409 (M.D. Tenn.1985), affirmed in relevant part, 822 F.2d 623 (6th Cir.1987); *Davidson v. Firestone Tire & Rubber Co.*, 84–1215 (W.D.Tenn. May 30, 1986) [Available on WESTLAW, DCT database]; *Sisk v. Firestone Tire & Rubber Co.*, 670 F.Supp. 695 (E.D.Mich.1986).

These cases rely on the arbitrary and capricious standard, so their holding is limited to the proposition that an employer does not act unreasonably if it denies severance pay when the former employees remain employed; such a holding does not necessarily mean that severance pay can be due only when employees are unemployed.

12. See note 4 above.

The cases suggest, however, that severance pay is intended only to compensate employees for losses they incur because they have no job. See, e.g., *Holland*, 772 F.2d at 1149 ("Burlington presented evidence that the plan was primarily intended for employees who suffered a period of unemployment when they were involuntarily terminated from their jobs").

■ Because the district court applied the wrong scope of review, and because application of that (arbitrary and capricious) standard was outcome determinative, we must reverse the summary judgment on Count I and remand for further proceedings consistent with this opinion. We suggest several principles of contractual construction which we believe will be relevant in the proceedings to come. We begin with several rules of interpretation which aid courts in identifying the intention of parties to a contract.

Some of the cases cited above suggest that there is a practice of paying severance pay whenever employees leave an employer, regardless of whether or not the employees are actually without a job for a time. At the same time, the defendants have cited cases showing that many employers do not pay severance pay unless the employees are in fact without a job. We have no way of telling which—if either—of these cases represents current practice. The district court should attempt to answer that question on remand. See Restatement (Second) of Contracts § 202(5) (instructing that "the manifestations of intention of the parties to a promise or agreement are interpreted as consistent . . . with any relevant . . . usage of trade").

Similarly, the defendants have argued that their own practice with respect to the Firestone Termination Pay plan is that benefits are paid only if employees are without any job when they cease work for Firestone. Plaintiffs have contested this version of Firestone's past practice. In determining the plan's meaning the district court should take account of such evidence of past practice under the plan. See Restatement (Second) of Contracts § 202(4).[13]

Additionally, plaintiffs have pointed to language in a Firestone memorandum which they claim supports their contention that a reduction in force includes any separation of an employee from Firestone regardless of whether or not the employee has another job. This evidence, if credited and if construed as plaintiffs invite the court to construe it, would also support the result for which they contend. See Restatement § 202(5) ("[w]herever reasonable, manifestations of the parties to a promise or agreement are interpreted as consistent with each other").

The district court may also find that, under the common usage in the trade, or under Firestone's past practice, Termination Pay is awarded even if employees remain employed if their compensation drops substantially when the employees cease to work for the employer. Here the parties disagree about whether or not the plaintiffs' compensation after the sale of the Plastics Division is as great as it was before—particularly with respect to benefits, such as the provision of Termination Pay. If the district court determines that the award of Termination Pay turns on the difference in the employees' compensation before and after the sale, it should ascertain the scope of any such difference in rate of pay.

It may be, however, that while these canons of construction prove helpful, they do not resolve the case by themselves. That is in part because this is a unilateral contract, and it may be that the parties here simply never agreed on what the term "reduction in force" would mean; if that is so then rules of interpretation designed to help courts identify that intention will not be helpful. The problem facing the district court on remand would then be akin to the difficulties a court faces when parties omit an essential term. The Restatement in-

---

**13.** That section provides:

Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

structs that in that circumstance "a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204. If the parties here did not agree on what would constitute a "reduction in force," so that the court cannot enforce their intention, then the court should adopt the most reasonable understanding of the term.[14]

## IV. SCOPE OF REVIEW AND COUNTS III AND V

We must also discuss the issue of scope of review in connection with Counts III and V. In Count III plaintiffs have alleged that certain representations in the Employee Handbook about the Early Retirement Plan estop Firestone from denying plaintiffs Early Retirement benefits and awarding them "deferred vested benefits" instead. In Count V plaintiffs contend that the sale of the Plastics Division constituted an early termination of the Stock Ownership Plan as described in ERISA, 26 U.S.C. § 411(d)(3), which in turn caused otherwise unvested rights in that plan to vest on the date of sale.

The district court held that defendants were not equitably estopped from denying plaintiffs Early Retirement benefits, and that there was no partial termination. But the arbitrary and capricious standard was not entirely absent from this part of the district court's opinion. The plaintiffs argued that the plan description led them to reasonably expect benefits, and that our holding in *Northeast Dep't ILGWU v. Teamsters Local 229 Welfare Fund*, 764 F.2d 147 (3d Cir.1985) therefore compelled the award of those benefits. The district court held that

> plaintiffs' theory is inconsistent with the standard of review under which I must approach this case, i.e. the arbitrary and capricious standard. *Northeast Dept. ILGWU*, 764 F.2d at 163. Defendants' decision must be sustained unless that decision was arbitrary and capricious. I

cannot defer to plaintiffs' interpretation although it is one factor to be considered. At 529.

The arbitrary and capricious standard also appears in the parties' arguments under Count V, having to do with an asserted partial termination of the plan, and in the district court's decision on that count. Plaintiffs argued that defendants were obliged to address the question whether there had been a partial termination; the defendants' failure to address that question, the plaintiffs argued, made the denial of benefits arbitrary and capricious. The district court held that the defendant's action was not arbitrary and capricious, and therefore that it was permissible under ERISA.

■ Because of the nature of the challenges advanced in Counts III and V, we believe that the question of deference to the administrator's decision has no place in the court's discussion of the claims advanced in those parts of the complaint. The standard of conduct governing the fiduciary is that his conduct not be "arbitrary, capricious, or made in bad faith, not supported by substantial evidence, or *erroneous on a question of law.*" *Rehmar v. Smith*, 555 F.2d 1362, 1371 (9th Cir.1977) (emphasis added). Whether or nor Firestone is equitably estopped from denying benefits is, for present purposes, a question of law. So is the question whether or not there was a partial termination.

■ Put another way, trustees only have discretion to decide those matters expressly delegated to them by the trust instrument. Comment *a* to Restatement of Trusts (Second) § 187 (emphasis added), which sets out the arbitrary and capricious standard, provides:

> The exercise of a power is discretionary except to the extent to which its exercise is required by the terms of the trust or *by the principles of law applicable to the duties of trustees.*

---

14. Even in this eventuality, however, the court will be helped in identifying the most reasonable term by the information discussed above

relating to the parties' and the industry's past practice and to Firestone's other statements regarding the term's meaning.

While the decision to grant or deny benefits may be committed to the trustee's discretion by a trust, the question whether there has been a partial termination, or whether or not the plan is equitably estopped from denying a claim, are never committed to the trustee at all. Those questions are governed by "the principles of law applicable to the duties of trustees." When posed to a court the court must answer them de novo. See *Rosen v. Hotel and Restaurant Employees*, 637 F.2d 592, 597 (3d Cir.1981) (ignoring arbitrary and capricious scope of review and determining equitable estoppel claim on the merits, without any deference to plan administrator).

## V. THE MERITS OF COUNT III (EARLY RETIREMENT BENEFITS)

At issue in Count III is the distinction between Early Retirement and Deferred Vested benefits. Three kinds of benefits are relevant for purposes of this Count.

The Retirement Plan provided that employees could retire with regular Retirement benefits at age 65. However, employees could also retire before age 65 if they had ten years of service, or if they were at least 55 years old and had thirty years of service. The Early Retirement benefit they would then receive would be equal to the Regular Retirement benefit minus .4% for each month by which the employee's age was less than 62, and .2% for each month by which the employee's age was less than 50.

Finally, an employee who was eligible for neither Regular or Early Retirement benefits could still receive deferred vested benefits, so long as he had ten years of service with Firestone. The deferred vested bene-

fit was smaller than the Early Retirement benefit, and was equal to the actuarial equivalent of the amount the employee would have received had he taken regular retirement at his last rate of pay.[15]

Predicating their claim on the theory of equitable estoppel, the plaintiffs argue in Count III that they are entitled to Early Retirement benefits, which Firestone refused to award plaintiffs, instead of the deferred vested benefit, which plaintiffs actually received. Plaintiffs argue that the plan misled them into believing that they would received the Early Retirement benefit and that they are therefore entitled to receive it.

The district court correctly summarized the requisites of an equitable estoppel claim: there must be a material misrepresentation or omission, reasonable reliance thereon, and damage. See *Rosen*, 637 F.2d at 597; *Consolidated Express v. New York Shipping Ass'n*, 602 F.2d 494, 510 (3d Cir.1979); see also Restatement (Second) of Contracts § 90 comment *a* ("Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation"). We agree with the district court that there has been no misrepresentation here, because the plan summary was sufficiently clear about the distinction between the early retirement benefit and the deferred vested benefit.

The employee handbook gives an example of how the early retirement benefit is computed, explaining that a 55 year old employee who elected to receive the early retirement benefit would receive 66.4% of the amount he would have received had he taken regular retirement.[16] The handbook gives no examples of how to compute a

---

**15.** The deferred vested benefit is paid over more years than the regular retirement benefit, because the employee begins receiving the former before he turns 65, when the latter begins. The actuarial equivalent of the regular pension benefit is an amount which reflects this fact, reducing the amount paid each month so that the present value of the total income stream is equal to the present value of the income stream produced by the regular pension benefit.

**16.** This number was computed as follows: The early retirement benefit is equal to the regular retirement benefit reduced by .4% for each month by which the employee's age is less than 62. A 55 year old employee is 84 months younger than 62, so his retirement benefit would be reduced as follows:

$$84 \times .4\% = 33.6\%$$

$$100\% - 33.6\% = 66.4\%.$$

deferred vested benefit, nor does it define the term "actuarial equivalent."

Several named plaintiffs testified in deposition that they expected to receive Early Retirement benefits when Firestone sold the Plastics Division. (Although they did not identify by name the benefit to which they thought they were entitled, these employees testified that they expected to receive 66.4% of the amount they would have received had they taken regular retirement. The precision of the employees' recollection as to the fraction of their regular retirement benefits represented by the benefit they expected makes clear that they were thinking of the early retirement benefit.)

While the named plaintiffs' testimony would certainly justify a finding that the plaintiffs did not understand how their benefits program worked, however, this evidence does not identify any factual misrepresentation in the handbook. The handbook correctly sets out the eligibility requirements for both the deferred vested and early retirement benefits. Indeed, the plaintiffs point to no statement in the handbook which they claim is false. The only fault plaintiffs can identify with the handbook is that while it gave examples of what the early retirement benefit would be for employees retiring at various ages, it gave no such examples for the deferred vested benefit. That is obviously not a misrepresentation, and it is not the omission of a fact: it is only the omission of what might have been a helpful explanation.

Finding no misrepresentation or omission, we need not investigate the merits of the other elements of an equitable estoppel claim.[17] The district court's grant of summary judgment for Firestone on Count III will be affirmed.

## VI. THE MERITS OF COUNT V (THE STOCK OWNERSHIP CLAIM)

In Count V plaintiffs contend that Firestone's sale of its Plastics Division consti-

tuted a partial termination of the Stock Ownership Plan within the meaning of ERISA, 26 U.S.C. § 411(d)(3).

The district court concluded that there was no partial termination because the Plastics Division's sale affected only a very small fraction of the total number of employees covered by the Stock Ownership Plan. In so holding the district court relied on a line of cases and I.R.S. Revenue Rulings which define a partial termination in terms of the percentage of employees in the plan who were affected by the corporation's transaction. See *Babb v. Olney Paint Co.*, 764 F.2d 240 (4th Cir.1985); *Ehm v. Phillips Petroleum Co.*, 583 F.Supp. 1113 (D.Kan.1984); *Wishner v. St. Luke's Hospital Center*, 550 F.Supp. 1016, 1019 (S.D.N.Y.1982); Rev.Rul. 81–27, 1981–1 C.B. 228; Rev.Rul. 73–284, 1973–2 C.B. 139; Rev.Rul. 72–439, 1972–2 C.B. 223. Under each of these authorities, the facts of this case would not constitute a partial termination, because only 2.2% of the employees covered by the plan were terminated. See *Babb*, 764 F.2d at 243 (12.84% not enough to constitute partial termination); *Ehm*, 583 F.Supp. at 1116 (2.5% not sufficient); *Wishner*, 550 F.Supp. at 1019 (3.7% not sufficient).

Plaintiffs argue, however, that these cases are either inapposite or wrongly decided, and that the Revenue Rulings are not dispositive on the question whether a partial termination has occurred for ERISA purposes. Our decision in *United Steelworkers v. Harris & Sons Steel Co.*, 706 F.2d 1289 (3d Cir.1983) supports the latter proposition, for we held there that facts constituting a partial termination for tax purposes will not necessarily constitute such a termination for ERISA purposes. We decided in *Harris* that Pension Benefit Guaranty Corporation insurance, which ERISA makes available only on partial termination, might in fact have been available

---

**17.** Plaintiffs make some suggestion in their briefs that we should judge misrepresentations particularly strictly in the ERISA context because of the employer's statutory obligation to write the plan "in a manner calculated to be understood by the average plan participant."

ERISA § 102, 29 U.S.C. § 1022. Plaintiffs do not articulate this argument clearly, however, and the plaintiffs apparently did not raise it before the district court. We accordingly do not address it.

to the plaintiff steelworkers even though the employer had not engaged in a tax code partial termination.

Plaintiffs argue further that whether a partial termination has occurred for present purposes should turn on the total number of employees affected, or the amount of money the employer saves by terminating the affected employees. In support of this proposition they cite *Weil v. Terson Co. Retirement Plan*, 750 F.2d 10 (2d Cir.1984), in which the Second Circuit held that a partial termination for ERISA purposes should be identified on the basis of "the number of employee terminations made in connection with" the transaction said to constitute the partial termination. Id. at 12.

We reject the plaintiffs' contention, and disagree with the approach taken by the Second Circuit in *Weil.* Section 411(d)(3) provides in pertinent part that

> a trust shall not constitute a qualified trust under section 401(a) unless the plan of which such trust is a part provides that—
>
>> (A) upon its termination or partial termination ...
>
> the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable.

This provision is intended to prevent employers from maintaining pension plans for the purpose of deferring income, and thereby reducing their taxes, rather than for the purpose of providing retirement benefits for employees. The penalty for violation of this section—i.e. for maintenance of a plan that does not provide for full vesting on partial termination—is loss of § 401 qualification—a very severe penalty. As a result of this provision, all qualifying pension plans contain the assurances required by this section. Plaintiffs can then sue on the basis of the plan language, as they have done here.

▆▆▆▆ We believe that the structure of the statute suggests that a partial termination should be found under § 411(d)(3)

only if so many people have been terminated that the plan appears to have been created as a mechanism for deferring the recognition of income, and thereby reducing taxes, rather than as a mechanism for the provision of retirement benefits to employees. That formulation suggests that the district court was correct in focusing on the percentage of employees in the plan who were affected by the transaction said to constitute a partial termination. Because that fraction was so low in this case—approximately 2%—the district court was also correct in holding that the sale of the Plastics Division did not constitute a partial termination.

We note that the plaintiffs' argument is essentially driven by the theory that the partial termination provision was designed to protect employees from dismissals motivated by an employer's desire to avoid paying pension benefits. That desire was indeed a very important goal of ERISA. But Congress pursued that goal in other sections of ERISA, by providing detailed mandatory vesting schedules, and such requirements are a much more precise way of solving the problem of strategically motivated dismissal. Attributing this goal to the partial termination provisions as well makes the partial termination provision seem both superfluous and clumsy. This consideration also supports the result we reach.

We note, however, that it is not easy to divine the purpose of § 411(d)(3). Without a clear sense of the provision's purpose it is difficult to decide what should and should not constitute a partial termination. Clarification from Congress or the Internal Revenue Service as to the purpose of this provision would make it substantially easier to enforce.

## VII. THE MERITS OF COUNT VII (REQUEST FOR INFORMATION)

In the last Count before us on appeal three of the named plaintiffs sue individually, alleging that the plan administrator failed to respond properly to their requests for information made pursuant to § 502(c)

of ERISA, 29 U.S.C. § 1132(c). That section provides:

> Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal.

The district court held that these plaintiffs were not entitled to relief under this provision because they had made their requests for information after they ceased to be Firestone employees. The district court held that, because they were no longer Firestone employees and because—as it had concluded earlier in the same opinion—they were not entitled to any benefits from any of the plans, the named plaintiffs were not "participants or beneficiaries" of the plans.

ERISA defines the term "participants" to mean

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7). The statute defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." Id. § 1002(8).

A line of cases in the Fifth and Ninth circuits takes the same approach as the district court here. See *Nugent v. Jesuit High School*, 625 F.2d 1285 (5th Cir.1980); *Weiss v. Sheet Metal Workers Local No. 544 Pension Trust*, 719 F.2d 302 (9th Cir. 1983); *Freeman v. Jacques Orthopedic & Joint Implant Surgery Medical Group*, 721 F.2d 654 (9th Cir.1983). These cases hold that one is a participant or beneficiary only if he is now receiving benefits from the plan or reasonably expects to receive them in the future because benefits which are now unvested can reasonably be expected to vest later.

The wording of § 502(c) is identical in this respect to the language in § 502(a), conferring standing to bring an ERISA claim. Section 502(a)(1) provides that a civil action may be brought, inter alia, "by a participant or beneficiary." 29 U.S.C. § 1132(a)(1). Applying the logic of the above opinions to the standing provision leads to the conclusion that one has no standing to bring an ERISA claim—i.e. no standing to claim that he is entitled to benefits—unless he is entitled to benefits.[18]

■ We reject that conclusion as well as the reasoning which leads to it. We do not think that a person lacks standing to claim an entitlement to benefits just because it turns out that he is in fact not entitled to those benefits. When a court holds that a claimant is not entitled to benefits, the claimant loses on the merits and judgment is entered against him. As a practical matter, therefore, courts normally read § 502(a) as if it read: "a civil action may be brought by *someone who claims to be* a participant or beneficiary."[19]

---

**18.** The Fourth Circuit, it should be noted, has expressly rejected this, holding that one may have standing to sue under § 502 even if he is not entitled to benefits. *Salomon v. Transamerica Occidental Life Ins. Co.*, 801 F.2d 659 (4th Cir.1986).

**19.** We have the same common sense understanding of provisions conferring standing and subject matter jurisdiction under other statutes. Section 4 of the Clayton Act, for example, confers jurisdiction on the federal district courts "to prevent and restrain violations of sections 1 to 7 of" title 15. We understand this provision to confer jurisdiction on the federal courts to hear *claims* that a violation has occurred (or will occur). If at the end of trial the court finds that there was no violation, so that the defendant wins, the victory is on the merits. We do not hold that, because there was no violation of the relevant antitrust provision, the court lacked subject matter jurisdiction.

We note that the Supreme Court rejected a similarly erroneous rule in *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), where the Court explained that a lack of standing should not be confused with a lack of subject matter jurisdiction.

We think that the same reading should be accorded § 502(c). A provision such as that one, entitling people to information on the extent of their benefits, would most sensibly extend both to people who are in fact entitled to a benefit under the plan and to those who claim to be but in fact are not. People who worked for a company for a time, and who are not certain whether or not they are entitled to benefits would obviously need the information § 502(c) discusses in order to know whether to press their claim.

Moreover, defendants' understanding would often allow the entitlement to information to turn on the plan administrator's belief as to the merits of the claimant's request for benefits. Yet simply because the plan administrator believes the claimant is not entitled to benefits does not mean that he is in fact not so entitled. The plan administrator might be wrong—as he may have been with respect to the Termination Pay plan at issue in Count I of this complaint. Even the cases we reject would permit the employee to recover damages under § 502(c) if the claimant sues and it turns out that he was entitled to benefits. But if the employee is left uninformed his rights may remain unvindicated even if the administrator is wrong, because the administrator's failure to provide information to the employee may prevent the employee from suing.

Finally, however,—and this is the most compelling reason for our holding— ERISA's legislative history makes clear that Congress intended the information-producing provisions to enable claimants to make their own decisions on how best to enforce their rights. See S.Rep. 93–127, 93d Cong. 1st Sess. at 27 (ERISA's reporting and disclosure requirements imposed so "that individual participants and beneficiaries will be armed with enough information to enforce their own rights"). That function can be performed only if all people with potential rights can obtain information.

Having said that, we concede that it is expensive and inefficient to provide people with information about benefits—and to permit them to obtain damages if information is withheld—if they are clearly not entitled to the benefits about which they are informed. But while this is indeed a problem, we do not believe it insuperable.

Section 502(c) grants significant discretion to the district court to decide whether to award damages under that provision. We think that that discretion can be used, for example by granting summary judgment in appropriate cases, to prevent strategic behavior by plaintiffs seeking to take unfair advantage of § 502(c)'s damage provisions when they are not entitled to any ERISA benefits. For example, if the employee's claim for benefits is not colorable, and if the employer displayed no bad faith in responding to the claim—taking somewhat too long to respond to it, for instance, but not ignoring it entirely—then the district court would be well within its discretion in setting damages at $0.

## CONCLUSION

For the foregoing reasons, we will affirm the summary judgment on Counts III and V. However, we will reverse the summary judgment on Counts I and VII, and remand those aspects of the case to the district court for further proceedings consistent with this opinion.