**Belinda Kay McKINNON, as Executrix of the Estate of Carl Hastings, Deceased, Plaintiff,**

v.

**BLUE CROSS–BLUE SHIELD OF ALABAMA, et al., Defendants.**

Civ. A. No. 87–AR–1093–S.

United States District Court,
N.D. Alabama, S.D.

June 17, 1988.

Supplemental Opinion July 8, 1988.

Gary P. Smith, and Clarence L. McDorman, Jr., Birmingham, Ala., for plaintiff.

Lawrence B. Clark, Sally S. Reilly, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

Belinda Kay McKinnon, in her capacity as the personal representative of her deceased father, Carl Hastings, sues under the Employee Retirement Income Security Act (ERISA) for benefits allegedly due under an employer-sponsored medical insurance plan as to which defendant Blue Cross–Blue Shield of Alabama (Blue Cross) is administrator, and as to which defendant Health Maintenance Group of Birmingham (HMG) is the insurer or provider.

This court begins by noting that the "central policy goal of ERISA is to protect the interests of employees and their beneficiaries in employee benefit plans." *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986), (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Ostensibly to accomplish this Congressional mandate, a seeming majority of the federal courts have announced the following holdings which this court finds strangely inconsistent with this "central policy goal":

1. That the beneficiaries of ERISA-type plans are not entitled to the trial by jury to which they were entitled pre-ERISA and to which they would have been entitled under the Seventh Amendment if ERISA had never been enacted. *But see, Whitt v. Goodyear Tire & Rubber Co.*, 676 F.Supp. 1119 (N.D.Ala.1987); *Hurt v. Pullman, Incorporated*, 764 F.2d 1443, 1445, n. 2 (11th Cir.1985); *Bugher v. Feightner*, 722 F.2d 1356 (7th Cir.1984), *cert. denied*, 469 U.S. 822, 105 S.Ct. 98, 83 L.Ed.2d 43 (1984); *Paladino v. Taxicab Industry Pension Fund*, 588 F.Supp. 37 (S.D.N.Y.1984); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987); *Bower v. Bunker*

*Hill Co.*, 675 F.Supp. 1254 (E.D.Wash. 1986); *Abbarno v. Carborundum Co.*, 682 F.Supp. 179 (W.D.N.Y.1988); *Woods v. Dunlop Tire Corp.*, 673 F.Supp. 117 (W.D. N.Y.1987).

2. That all state causes of action which plan beneficiaries could otherwise have pursued are pre-empted by ERISA. *But see, Fort Halifax Packing Co., Inc. v. Coyne*, —— U.S. ——, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *Bittner v. Sadoff and Rudoy Industries*, 728 F.2d 820, 825 (7th Cir.1984); *Totton v. New York Life Ins. Co.*, 682 F.Supp. 731 (D.Conn.1988); *Planned Consumer Marketing, Inc. v. Coats & Clark*, 71 N.Y.2d 442, 522 N.E.2d 30, 527 N.Y.S.2d 185 (N.Y.1988); *Schlenz v. United Airlines*, 678 F.Supp. 230 (N.D. Cal.1988); *Schultz v. National Coalition of Hispanic Mental Health & Human Services Organizations*, 678 F.Supp. 936 (D.D. C.1988); *c.f. Lingle v. Norge Division of Magic Chef, Inc.*, —— U.S. ——, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Whether or not the word "pre-empted" means "incorporated to a considerable degree into ERISA," or means "subsumed by ERISA," or means "eliminated entirely by ERISA," is a question which remains to be decided. *See Amos v. Blue Cross–Blue Shield of Alabama*, 681 F.Supp. 1515 (N.D.Ala.1988), and cases therein cited.

3. That a plan beneficiary can recover only if he can prove that the denial of his alleged benefits was "arbitrary and capricious." This concept arguably removes from any sphere of operation the rule of contract construction which holds that ambiguities are to be resolved against the draftsman who, in the ERISA context, is invariably the employer and/or its insurer. The post-trial brief filed by Blue Cross–HMG argues, *inter alia:*

> Our first response might well be that the contract is clear and unambiguous and even under general contract law HMG's interpretation is the correct one. But it is probably more legally correct to point out that general principles of contract law interpretation do not apply to ERISA plans.

Some courts seem to believe with Blue Cross and HMG that to prove that a denial was "arbitrary and capricious" virtually requires proof of an element of bad faith, as well as a lack of rational basis for the decision. *But see, Deak v. Masters, Mates and Pilots Pension Plan,* 821 F.2d 572 (11th Cir.1987) *cert. denied,* — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134 (3rd Cir.1987) *cert. granted,* — U.S. —, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988); *Reilly v. Blue Cross and Blue Shield United of Wisconsin,* 846 F.2d 416 (7th Cir.1988).

4. That in judging whether or not the decision to deny benefits was "arbitrary and capricious," the reviewing court can consider only the evidence which was actually available to the decider or which the decider himself should have sought out. This is the position which Blue Cross and HMG take in this case. The court has found no authority "pro" or "con" on this question.

5. That punitive damages can never be recovered by a plan beneficiary, no matter how guilty of bad faith the decider-fiduciary may have been and no matter how egregious the breach of fiduciary obligation may have been. Blue Cross and HMG take this position.

6. That an oral promise or an oral modification of a written plan, even if relied upon by the beneficiary to his detriment, cannot form a basis for the granting of relief under theories of oral contract or estoppel. This is the position of Blue Cross and HMG.

7. That an employee benefit plan can contain a binding arbitration clause which, if thus contained, precludes a beneficiary's access to the courts forever. *But see,* dissent of Judge Gibson in *Sulit, Inc. v. Dean Witter Reynolds, Inc.,* 847 F.2d 475, (8th Cir.1988).

With this set of still debated principles as the background for this ERISA case, this court makes the following findings of fact.

## Findings of Pertinent Fact

On or about November 3, 1983, Mr. Hastings was an enrolled member of HMG through his former employer, United States Steel Corporation. According to the "Agreed Summary" contained in the pretrial order, Mr. Hastings was insured against monetary loss resulting from hospital, surgical, medical and major medical expenses, subject, of course,. to the terms and limitations of the master contract between U.S. Steel and "Blue Cross." Blue Cross' connection with HMG will become apparent. HMG was organized as a health maintenance organization to provide prepaid comprehensive health care for the benefit of U.S. Steel employees and their families, with services offered exclusively through the facilities at Lloyd Noland Hospital, a hospital which provides office space for HMG. HMG is a wholly-owned subsidiary of Blue Cross.

Dr. Geller, a staff physician at Lloyd Noland, was the claims evaluator or decider for HMG. He wore two hats. One was worn as an employee of Lloyd Noland. As such he had a direct interest in Lloyd Noland's level of profitability. His other hat was worn as the claims evaluator for HMG, which, according to the plan, provided hospital services to beneficiaries **only at Lloyd Noland** with certain narrow exceptions.

One of these narrow exceptions in this particular plan, and here implicated, is an exception for medical treatment needed by a beneficiary but not available at Lloyd Noland. Another exception which may be here implicated is for a situation where so-called "emergency" treatment is needed.

There was ample motivation for Dr. Geller, in his evaluation of a claim for medical services delivered at a facility other than at Lloyd Noland, to give the benefit of doubt to Lloyd Noland and not to the plan beneficiary's choice. .In the event of conflicting claims for reimbursement between hospital providers within the exceptions under the plan, any decision by Dr. Geller in favor of Lloyd Noland was automatically suspect.

Mr. Hastings was diagnosed at Lloyd Noland as having lung cancer. He was

unequivocally told at Lloyd Noland by its Dr. Jones that surgery was not indicated, and Dr. Jones made it plain to Mr. Hastings that he had no intention of performing lung surgery. Instead, he recommended radiation therapy at University Hospital because Lloyd Noland did not have the required therapeutic radiation equipment. Such treatment at University Hospital would clearly be covered by the plan. Mr. Hastings was thereupon admitted to University Hospital where its physicians suggested chemotherapy with an experimental component. A confrontation over the course of Mr. Hastings' treatment, and its financing, ensued. This confrontation involved Lloyd Noland, University Hospital, Mr. Hastings, Ms. McKinnon, Dr. Geller and the office of Congressman Erdreich. As a result of this confrontation, HMG, speaking through Dr. Geller, turned down University Hospital's claim for HMG funding of the proposed chemotherapy. Ms. McKinnon and Mr. Hastings, in cooperation with unnamed persons at University Hospital and representatives of Mr. Hastings' labor union, sought the assistance of Congressman Erdreich, whose office unsuccessfully applied pressure to Blue Cross-HMG on behalf of Mr. Hastings to honor his claim.

Ms. McKinnon, herself, was at that time an employee of Blue Cross. While the "flap" over the proposed chemotherapy was in progress, the surgeons at University Hospital decided, and revealed or clearly implied to Ms. McKinnon and Mr. Hastings, that there had been a misdiagnosis at Lloyd Noland and that a lung resection was indicated as a possible cure for Mr. Hastings' cancer. Mr. Hastings and Ms. McKinnon did not ask Lloyd Noland, HMG or Blue Cross whether or not Lloyd Noland would, contrary to its surgeon's earlier position, go along with this new University Hospital diagnosis, prognosis and suggested course of treatment, and now perform the indicated surgery at Lloyd Noland, despite its doctor's earlier opinion. Instead, Mr. Hastings promptly agreed to the surgery at University Hospital, motivated largely, if not exclusively, by a distrust of Lloyd Noland. The lung surgery was thereupon performed at University Hospital. This surgery created the medical expenses here in controversy.

After the surgery, Ms. Cobb, Blue Cross' claims supervisor, and other persons with high level claims authority at Blue Cross–HMG, assured Ms. McKinnon that the University Hospital's surgery bill would be paid under Mr. Hastings' medical plan. Nobody at Blue Cross–HMG denies that these promises were made. In fact, a memorandum of April 23, 1984, from Ms. Cobb to Dr. Geller confirms that Ms. Cobb made such a promise to Ms. McKinnon. Ms. Cobb there said:

> Because of the questionable circumstances involved, **HMG is paying for these claims**. However, if a portion of the liability lies with a bad decision from LHN [Lloyd Noland] doctors, I'd like to discuss this further with George Odom [Lloyd Noland's representative]. **We have had cases before where George paid or shared in payment of claims that should have been done here** [Lloyd Noland].

(emphasis supplied).

While believing that the University Hospital's bill would be paid, Ms. McKinnon was suddenly called in by Mr. Oglesby, the highest officer in charge of claims at Blue Cross where she was employed. Mr. Oglesby was also in final charge of claims submitted to HMG. At the meeting he was flanked by a Blue Cross lawyer and by other Blue Cross officials. Mr. Oglesby angrily pronounced, in substance:

> I can't believe that you went to the Congressman! We are not going to pay a thing on your claim to University Hospital!

Dr. Geller admits that Mr. Oglesby had the authority to make the final decision to grant or deny HMG benefits, although there is no evidence that Mr. Oglesby ever reviewed or officially commented on Mr. Hastings' claim or on Dr. Geller's denial of the claim. Dr. Geller's denial decision was probably academic, because Mr. Oglesby was in a position to have made good on his threat. Mr. Oglesby was the claims "boss" at HMG as well as at Blue Cross. There

was no need for Mr. Olgesby to make good on his threat, because Dr. Geller fortuitiously reached the same conclusion that Mr. Oglesby had promised. Mr. Oglesby made it quite clear that a Blue Cross employee's invocation of help from her Congressman was an unforgivable sin, calling for strong response from Blue Cross–HMG. It is more than interesting that no witness took the witness stand to deny Ms. McKinnon's testimony about what transpired in Mr. Oglesby's office.

As already noted, after Dr. Geller's review of whatever materials he reviewed, Mr. Hastings' claim was denied. No hearing, formal or informal, was conducted, and Dr. Geller never shared with Mr. Hastings or with Ms. McKinnon his reason or reasons for the denial. They were left in the dark unless they could intuit or deduce Dr. Geller's reasons. No evidence was offered of a letter or other written communication from Blue Cross or from HMG to Mr. Hastings or to Ms. McKinnon articulating a rationale for their denial of the surgical benefits. There was no proof that the lengthy written benefits plan itself, or its abbreviated summary of benefits, described or set forth a process for contesting or for reviewing a disputed claim, although such procedures and the disclosure of the denial rationale are clearly mandated by ERISA under 29 U.S.C. § 1133 and set forth in detail under 29 C.F.R. § 2560.503–1 *et seq.* Although not here urged by Ms. McKinnon, a violation of this section would create a claim under the civil enforcement provisions of ERISA, § 1132, which is here invoked by Ms. McKinnon as a basis for the relief she seeks.

At trial and during discovery, Dr. Geller testified that he denied this particular claim because this particular surgery could have been performed at Lloyd Noland, where he is a staff physician. He further testified that he also denied the claim because the surgery was not of an "emergency" nature. He articulated no other reasons. After the denial, Ms. Cobb wrote an "Inter-Office Memo" to Dr. Hamrick, President of Lloyd Noland, asking Lloyd Noland whether or not because of alleged misdiagnosis it would reimburse University Hospital for

the claim being denied by HMG. Why a memo between Blue Cross and Lloyd Noland was called "inter-office" goes unexplained. Previously, during and after Ms. Cobb's assurances to Ms. McKinnon that University Hospital's surgical claim would be paid, Ms. Cobb wrote several memos or requests in an effort to ascertain whether or not, in fact, there had been a misdiagnosis by Lloyd Noland. This was an inquiry which Blue Cross–HMG now says is totally irrelevant. In other words, defendants say that even if there were a misdiagnosis by Lloyd Noland, denial of benefits still was within an appropriate interpretation of the contract language and therefore, as a matter of law, could not be "arbitrary and capricious."

Dr. LoBuglio, the head surgeon on the Hastings case at University Hospital, commented in an inter-office note: "Obviously his [Lloyd Noland's surgeon's] evaluation at LN [Lloyd Noland] was inadequate and resulted in their conclusion that he [Mr. Hastings] should receive palliative care rather than curative intent." Dr. LoBuglio also testified by deposition with respect to his decision to operate:

> Physicians in one setting do not make pivotal decisions like surgery for another group of physicians. So I would take it that, just like the Lloyd Noland physicians sending a patient here for radiation therapy, we don't just do radiation therapy, we evaluate the patient.

It is clear, then, that a referring hospital or medical group cannot call crucial "shots" for the hospital or medical group receiving the referral. This is a self-evident truth, known, of course, to Blue Cross–HMG.

Dr. Geller, the Lloyd Noland staff physician and colleague of the Lloyd Noland surgeon alleged to have misdiagnosed Mr. Hastings, testified that in his opinion there had been no misdiagnosis at Lloyd Noland. He did not state whether or not his professional disagreement with Dr. LoBuglio played any part in his decision to deny Mr. Hastings' claim. As noted, Blue Cross–HMG denies that a misdiagnosis, if one occurred, was or could have been relevant. Before the denial of benefits, Dr. Geller did

have available to him University Hospital medical records, which included Dr. LoBuglio's allegation of a misdiagnosis. Before the denial, Dr. Geller was **not** presented with and **did not consider** any legal arguments, such as: (1) the meaning of the word "emergency," as used in this plan under this unique set of circumstances, where Mr. Hastings had understandably lost confidence in Lloyd Noland when it arguably had misdiagnosed him in the face of a life-threatening and very likely rapidly developing disease; or (2) the effect of an oral promise by Blue Cross–HMG to pay made after the surgical services had been rendered by University Hospital; or (3) the threatened denial of the claim as retaliation for Ms. McKinnon's having embarrassingly sought her Congressman's intervention.

The ERISA-required summary of benefits provided by Blue Cross–HMG uses both the term "Emergency Medical Care" and the term "Life-threatening Emergency." This difference can raise in a reasonable mind the thought that these two terms are not synonymous. There is no explanation in the plan for the use of both terms.

The amount of the University Hospital surgical bill denied by Blue Cross–HMG is $15,284.55. None of this sum represents any charge for chemotherapy or radiation therapy. It is attributed entirely to the surgical procedure and aftercare at University Hospital for Mr. Hastings.

### Conclusions of Law

Traditionally, the first question addressed under "Conclusions of Law" in a non-jury case is the question of jurisdiction. For reasons which will become apparent, the court will address the question of jurisdiction as the last legal issue in this opinion.

■ Blue Cross–HMG is (or are) represented by the same counsel. Blue Cross now equivocates on the question as to whether or not HMG is the only proper party defendant. In view of the fact that HMG technically was the provider and the decider, if defendants seriously contend that HMG is the only proper defendant, the court disagrees. Blue Cross was the plan administrator. HMG is its wholly owned subsidiary and occupies office space both at Blue Cross and at Lloyd Noland. Blue Cross was deeply involved in evaluating Mr. Hastings' claim. In fact, HMG and Blue Cross are as closely related to each other as HMG is related to Lloyd Noland. In both instances, they are "two peas in a pod." HMG is Blue Cross' alter ego and vice versa. It is fair to refer to them, as this court has already done, as Blue Cross–HMG. In an affidavit executed on May 27, 1987, Ms. Cobb, who wrote many memos on Blue Cross stationery, described herself as "department manager of Health Maintenance Group of Birmingham–Administrator," an entity which she said "is an affiliate of Blue Cross and Blue Shield of Alabama." This was her understatement of the fact that the two entities constituted, as a practical matter, a single entity. They operated as one. Even their lawyers were confused, as will hereinafter appear.

■ There are basically two problems to be resolved in this case. The first is whether or not the "arbitrary and capricious" standard is to control; and the second is, assuming that the "arbitrary and capricious" standard is to be applied, how is it to be defined and employed in the factual context of this case.

*Bruch v. Firestone Tire & Rubber Co.,* while recognizing the "arbitrary and capricious" standard, holds "that courts will not defer to a trustee's judgment when a conflict of interest threatens the trustee's impartiality." 828 F.2d at 141. For this proposition, the Third Circuit pointed out that there are "cases reflect[ing] significant dissatisfaction with the arbitrary and capricious standard when the employer can profit from its decision to deny benefits." 828 F.2d at 140. The Third Circuit addressed the premise that the primary reason for this most deferential standard of review is that courts should usually rely on trustees' greater expertise in interpreting the plan's terms, and reached the following conclusion:

We reject this rationale for two reasons. First, in the context of claims for benefits, the questions which courts

must address do not usually turn on information or experience which expertise as a claims administrator is likely to produce. As in this case, the validity of the claim is likely to turn on a question of law or of contract interpretation. Courts have no reason to defer to private parties to obtain answers to these kinds of questions. Secondly, as we have explained, there is a significant danger that the plan administrator will not be impartial. The lack of impartiality offsets any remaining benefit which the administrators' expertise might be thought to produce.

828 F.2d at 144 (footnote omitted).

While this court is inclined to agree with the Third Circuit, it is not sure what the Supreme Court will do after having granted certiorari, or whether the Eleventh Circuit would subscribe to the Third Circuit's ideas as expressed in *Bruch v. Firestone.* Therefore, the court proceeds on the assumption that it must evaluate defendants' denial of benefits to Mr. Hastings under the criteria outlined in *Harris v. Pullman Standard, Inc.*, 809 F.2d 1495, 1498 (11th Cir.1987). These criteria are:

1. Uniformity of construction.
2. "Fair reading" and reasonableness of that reading.
3. Unanticipated costs.
4. Internal consistency of plan under the interpretation employed by the decider.
5. Any relevant regulations formulated by the appropriate administrative agencies.
6. Factual background of the determination, and any inferences of a lack of good faith.

During trial, Blue Cross–HMG had difficulty deciding what evidence it should object to on the ground that the evidence had not been available to Dr. Geller. This difficulty may have several explanations, about which the court will not speculate. Without precise objections having been made to the various items of evidence offered, every piece of evidence relevant to the determination by Blue Cross–HMG, or which may have influenced that determination, was received into evidence, and in many instances it was and is impossible for the court to ascertain whether, in fact, Dr. Geller or any other official of Blue Cross–HMG had, or should have had, each piece of information which this court now has.

In this case, there is only meager evidence to reflect that the construction placed on the plan language by Blue Cross–HMG was not "uniform." The evidence, while meager, is persuasive. It consists of Ms. Cobb's memo of August 23, 1987, which indicates that similar claims for reimbursement for the cost of services which **could have been performed** at Lloyd Noland, **but were not performed** at Lloyd Noland, had on earlier occasions nevertheless been paid by Blue Cross–HMG, in whole or in part. Ms. Cobb did not testify, a fact which leaves the inferences to be drawn from her said memo of August 23, 1987 entirely to the court. In Ms. Cobb's absence, the court has resolved any ambiguities against Blue Cross–HMG.

This court cannot say that Dr. Geller's reading of the pertinent contract language was not "fair" or "reasonable." In fact, assuming that Dr. Geller played lawyer and semanticist as well as doctor, he performed his secondary roles well.

The court is a little unsure of the exact meaning of "unanticipated costs," as used in *Harris v. Pullman Standard,* but if these words can bring into more serious question a denial of payment when the expenses incurred are of a kind not contemplated by the contracting parties, then there were "unanticipated costs" incurred by Mr. Hastings in this situation, and this factor would militate in favor of Mr. Hastings. The fact that these costs were "unanticipated," or in some way unique, may explain Congressman Erdreich's feeling that the claim deserved his attention.

There is no evidence that the plan was internally interpreted in any "inconsistent" way, that is, unless this factor overlaps factor No. 1, above, dealing with "uniformity."

The absence of any evidence at trial showing that Blue Cross–HMG informed

Mr. Hastings or Ms. McKinnon of its reasons for denying the claim, as required under the claims procedures of § 1133 of ERISA and 29 C.F.R. § 2560.503–1, provides support for a finding that Blue Cross–HMG acted "arbitrarily and capriciously" under the fifth *Harris v. Pullman Standard* factor. This fifth factor recognizes that such an omission is an indicator of an administrator's lack of good faith in making an adverse determination. As far as this court is concerned in the instant case, the most crucial area of inquiry mandated by *Harris v. Pullman Standard* is this fifth factor on its list, namely, the factual background and the possible inference of a lack of good faith. This factor tends to blur any distinction between the rationale of *Harris v. Pullman Standard* and the rationale of *Bruch v. Firestone.* Here the pertinent facts create a distinct inference of a lack of good faith.

■ Where some but not all of the factors in *Harris v. Pullman Standard* appear, it is necessary to determine which of the elements outweighs which of the other elements, assuming that they militate in different directions. In the abstract, Dr. Geller's decision was perfectly rational and in accordance with a legitimate and fair reading of the contract language. How, then, could the Blue Cross–HMG decision be characterized as "arbitrary and capricious"? Blue Cross–HMG argues that if its reading of the contract can be defended as rational, the inquiry is over. But neither the Eleventh Circuit nor any other federal court cited by defendants has yet held that if a plan's language facially justifies a denial, this fact pre-empts consideration of the other factors outlined in *Harris v. Pullman Standard,* leaving them no field of operation. Second, does the arbitrary-and-capricious equation under *Harris v. Pullman Standard* change as a result of the fact that Blue Cross–HMG reneged on Ms. Cobb's promise to pay after Mr. Oglesby's display of anger over Ms. McKinnon's approach to her Congressman? Third, does the obvious conflict-of-interest in which Dr. Geller found himself change the equation? Fourth, does the diagnostic mistake made by Lloyd Noland change the equation and turn this particular debatable surgery into a medical "emergency," contrary to the ordinarily understood meaning of the word "emergency"? Last, does the fact that Blue Cross–HMG had previously paid claims for non-emergency services **that could easily have been rendered at Lloyd Noland** change the equation?

On May 8, 1988, in a case that interestingly also involved Blue Cross, the Seventh Circuit, in overruling a grant of summary judgment with respect to an insured's ERISA claim, refused to be controlled by a strict reading of the contract language and instead held that the formula used by Blue Cross to categorize "in vitro fertilization" as "experimental" may have been "arbitrary and capricious." *Reilly v. Blue Cross and Blue Shield United of Wisconsin,* 846 F.2d 416. While there are distinctions between *Reilly* and the instant case, *Reilly* does indicate that unusual factual circumstances can alter a definition, especially inasmuch as ERISA speaks expressly, impliedly and loudly of "equity."

Blue Cross–HMG relies heavily on *Nachwalter v. Christie,* which states the proposition that an ERISA plan cannot be modified by oral agreement or by estoppel. 805 F.2d at 959. This court does not quarrel with *Nachwalter,* but neither does the court depend solely upon the fact that Ms. Cobb orally promised payment. This court is persuaded by the fact that Ms. Cobb's promise **reflected a legitimate interpretation of the contract under the circumstances.** Ms. Cobb's interpretation was just as good as Dr. Geller's interpretation. Perhaps it was better under this peculiar set of circumstances.

Ms. McKinnon correctly cites *Schofield v. Great Atlantic & Pacific Tea Co.,* 43 N.C.App. 567, 259 S.E.2d 338 (N.C.App. 1979) *judg't vacated,* 299 N.C. 582, 264 S.E.2d 56 (N.C.1980), for the proposition that the word "emergency" can vary with the factual context.

Without necessarily deciding the priority of the various *Harris v. Pullman* factors, the court finds that each factor, while taken separately, might not in this case lead

ineluctably to the conclusion that defendants' actions were "arbitrary and capricious," when taken in the aggregate, they do lead ineluctably to that conclusion, and a *fortiori* to the conclusion that Ms. McKinnon is due to be paid by Blue Cross-HMG for her father's surgery at University Hospital.

This court would have much preferred to submit this case to a jury. The court believes that a jury would have reached the same conclusion which this court has reached. Of course, this is pure conjecture and speculation by the court and in no way has influenced this court's decision.

### The Jurisdictional Question

█ This case has an interesting aspect never raised or argued by the parties. Because the court always has the obligation to examine its own jurisdiction, the court now raises the question of the propriety of the removal of this case from the State court by Blue Cross-HMG. The original complaint was filed in the Circuit Court of Jefferson County, Alabama, on September 28, 1984. It named Blue Cross as the only defendant. Blue Cross entered its appearance in the State court on or about November 30, 1984. Blue Cross' initial appearance in the State court said, *inter alia:*

> While acknowledging that a contract for health care benefits existed between Carl Hastings and defendant [Blue Cross], defendant denies that said contract was in any way breached....

It is obvious that Blue Cross well knew in 1984 that ERISA provided federal question jurisdiction on which a removal to federal court could be based, and yet Blue Cross did not remove within the required 30 days. Blue Cross also knew when it was first served what it did not admit until February 6, 1987, in an amendment to its answer and a request for admissions, i.e., that Blue Cross was not, in fact, the directly contracting party but rather was only the administrator for HMG, the contracting party. According to the unequivocal evidence at trial, HMG is a wholly owned subsidiary of Blue Cross. If ever two defendants

were in privity and were alter egos for each other, Blue Cross and HMG are.

On May 28, 1987, Blue Cross filed in the State court a motion for summary judgment. This motion was based, in part, on Blue Cross' then new contention that HMG was the only proper party defendant. On June 2, 1987, Ms. McKinnon, in response to Blue Cross' motion for summary judgment, amended her complaint in the State court to add HMG as a party defendant, seeking to obviate a possible problem, which this court does not believe to have been a problem. Whether or not the State court would have thought it a problem is an academic question at the moment. On June 24, 1987, within 30 days after being served, HMG removed the case based on its allegation that federal question ERISA jurisdiction exists. Blue Cross purported to join in this removal petition. The same attorneys represented both "peas in a pod" on removal and have represented them both in this court since that time.

The belated jurisdictional question is whether or not, under these circumstances, HMG could remove and/or whether Blue Cross could join in the removal petition when Blue Cross, the parent corporation and alter ego of HMG, could have removed three years earlier but, for reasons of its own, chose not to remove timely. Obviously, Blue Cross could not by itself have removed when HMG purported to remove. In this court's opinion, Ms. McKinnon could have proceeded with her ERISA claim against Blue Cross without ever adding HMG, despite Blue Cross' motion for summary judgment. The State court has concurrent jurisdiction with the federal court over this type of ERISA action under 29 U.S.C. § 1132(a)(1)(B). In other words, federal jurisdiction over an ERISA action under § 1132(a)(1)(B) **is not exclusive.** Ms. McKinnon only added HMG out of an abundance of caution and in order to obviate what she feared might be a technical defense. By adding HMG, did Ms. McKinnon thereby open herself to this removal? And, if so, has Ms. McKinnon, by not having filed a motion to remand and by proceeding to trial on the merits, waived the untimely and improper removal and inad-

vertently or deliberately conferred jurisdiction on this court?

## SUPPLEMENTAL OPINION

The parties, as requested, have responded to the order to show cause entered on June 17, 1988. From these responses and from the court's further research, the court concludes, as does Professor Moore in 1A *Moore's Federal Practice* ¶ 0.168 [3-5-7], at 601 (2nd Ed.1987), that the 30-day time period for removal pursuant to 28 U.S.C. § 1446(b) is merely modal and that an untimely removal is a procedural rather than a jurisdictional defect, which, in this instance, has been thoroughly waived by plaintiff Belinda Kay McKinnon, or which, by having proceeded to and through a trial on the merits, she is estopped to raise. Therefore, even if she now sought a remand to the state court (which she does not do), she would be too late. On the other hand, defendants, Blue Cross–Blue Shield of Alabama and Health Maintenance Group of Birmingham, are not in a position to take advantage of their own procedural shortcomings.

In accordance with the memorandum opinion of June 17, 1988, plaintiff, Brenda Kay McKinnon, as Executrix of the estate of Carl Hastings, deceased, shall have and recover of defendants, Blue Cross–Blue Shield of Alabama, a corporation, and Health Maintenance Group of Birmingham, a corporation, the sum of $15,284.58, which said sum shall be paid direct to plaintiff's counsel who, upon receiving said sum, shall satisfy this judgment on the records of this court.

Costs are taxed against defendants.